1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9       FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   DEANDRE MARQUIS ROGERS,            No. 2:20-cv-2421 DAD AC
12                Petitioner,
13        v.                            FINDINGS & RECOMMENDATIONS
14   WARREN L. MONTGOMERY,
15                Respondent.
16

17        Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on Claims One and Two[1] of the

19   Amended Petition, ECF No. 6, which challenges petitioner's 2018 conviction for possession of a

20   firearm by a felon, and the resulting aggregate third-strike sentence of thirty years to life.

21   Respondent has answered, ECF No. 17, and petitioner has filed a traverse, ECF No. 18.

22                               BACKGROUND

23     I.      Proceedings in the Trial Court

24            A. Preliminary Proceedings

25        Petitioner was charged in Sacramento County with two counts of possession of a firearm

26   by a felon.  One count related to Petitioner's alleged possession of a .45 caliber Glock and one

27   ─────────────────────
28   [1]  See ECF No. 7 (Findings and Recommendations); ECF No. 10 (order adopting Findings and
     Recommendations and dismissing Claims Three through Five).

count related to Petitioner's alleged possession of a .40 caliber Glock.

      B.  The Evidence Presented at Trial[2]

        1.  Prosecution Case

On December 15, 2016, at approximately 4:00 p.m., law enforcement officers were called to investigate a 911 call from a female, G.K., reporting that she had been involved in a domestic dispute with petitioner.  G.K. reported that petitioner was carrying a handgun.

Law enforcement officers began tracking petitioner, who was on parole, using the GPS monitoring bracelet he was wearing.  Officers followed petitioner, first to a house belonging to the family of a deceased gang member and then to a sushi restaurant.  Petitioner entered the restaurant and stayed inside for about an hour before coming out and standing next to an Infiniti SUV.  Officers watched petitioner open the right passenger door of the Infiniti and lean in as if he were manipulating something.

About this time, a Mercedes sedan pulled up behind the Infiniti.  M.D., a female friend of petitioner, was the owner of the Mercedes and was driving the vehicle. N.T., another female friend of petitioner, was sitting in the front passenger seat.  Both M.D. and N.T. are closely associated with members of the G-Mobb gang.

As the Mercedes approached, petitioner walked over to the car and leaned in the driver's side window.  He then briefly went back into the restaurant.  When he re-emerged, petitioner got into the rear seat of the Mercedes on the driver's side.  Because the windows of the car were tinted, officers could not see what petitioner was doing inside.

With M.D. driving, the Mercedes pulled out of the parking lot, but, as officers followed, it immediately reentered the parking lot.  When officers converged on the vehicle, petitioner got out of the car and attempted to walk away.  Officers apprehended petitioner about 15 feet from the vehicle.

Officers searched the Mercedes and found a .45-caliber Glock handgun with a loaded high-capacity magazine.  The gun was found on top of the floor mat under the driver's seat.

---

[2] This summary is adapted from the opinion of the California Court of Appeal, ECF No. 16-8 at 2-6.

1   Because of the location of the seat control box under the driver's seat, a person in the rear seat

2   could not have slid the gun forward underneath the seat.

3        Officers arrested petitioner.  While he was being processed, petitioner asked if the driver

4   of the vehicle (M.D.) also would be going to jail.  Told that she probably would, petitioner

5   responded, "I don't even know [her].  It doesn't matter though.  She's going to take it anyway."

6        *Testimony of M.D. and N.T.*

7        At trial, both M.D. and N.T. testified that N.T. had borrowed M.D.'s car on the day of the

8   incident.  N.T. initially testified that during the time she borrowed the car, she had allowed a male

9   friend named "Erocka" to drive the car.  However, on cross-examination, N.T. admitted she and

10  a G-Mobb gang member had concocted the story about Erocka to attempt to explain how the gun

11  might have been placed in the car.

12       M.D. and N.T. denied that the gun found in the Mercedes belonged to petitioner and

13  claimed not to know how the gun got in the car.  M.D. admitted, however, that she had a romantic

14  relationship with petitioner and, at one time, had planned to marry him.  N.T. similarly described

15  petitioner as a "[c]lose friend" and "like a brother to [her]."  N.T. admitted that she wrote an e-

16  mail to petitioner in jail vowing to do "whatever I can for you . . . no questions asked."

17       *Recorded jail conversations*

18       During trial, the prosecution played several recorded jail conversations involving

19  petitioner, N.T., and M.D.  In one call, recorded shortly after the incident, an unidentified female

20  told N.T. that petitioner should take responsibility for the gun rather than let M.D. do so: "[H]e

21  should have been like that's not hers.  That's mine."  N.T. responded, "Exactly. Like how you

22  gonna let her get locked uh, arrested for something that yours?  What the fuck?  If you're

23  fucking riding around with a gun, you need to be prepared to fucking take that charge because I

24  know I'm not."

25       In another call, recorded later that night, petitioner told N.T. that M.D. needs to "[k]eep

26  her mouth shut."  N.T. remarked, "They already knew we was lying though," to which petitioner

27  responded, "Yeah I know."

28  *////*

3

1    On December 17, 2016, petitioner was recorded telling G.K. that he wished he had cut off

2    his ankle monitor.  He complained: "[The police] want me to be in jail or they want me to get

3    killed.  'Cause either you want me to have it on me so you can take me to jail or you want me to

4    not have it on me so one of these niggas could blow me."

5    A couple of weeks later, N.T. was recorded discussing the incident with an inmate.  N.T.

6    told the inmate that just before officers converged on the Mercedes, petitioner said, "'[G]rab it,

7    grab it.'  And I'm lookin' back like, 'Shit.'  I can't fuckin' do shit 'cause these motherfuckin

8    police is already lookin' at me."  N.T. then continues to tell the inmate, "But the fucked up part

9    about it, the only thing that might fuck him off a little bit is it was the same one that he . . . just

10   did a video to.  He did a video to one of his songs and it's the same motherfuckin' shit that was in

11   that video."  On cross-examination, N.T. admitted that her statement about the video was

12   referring to guns.

13   *Gang evidence*

14   Detective Kenny Shelton, a gang expert who was assigned to the gang suppression unit of

15   the Sacramento County Sheriff's Department, testified that petitioner was a validated member of

16   the G-Mobb gang and various subsets that align with that gang.  He testified that the

17   primary activities of the G-Mobb gang include robberies, assaults with a deadly weapon, gun

18   charges, drive-by shootings, and homicide.  He also testified that gang members often use females

19   to rent houses, buy vehicles, or hide firearms.

20   Detective Shelton explained that modern gangs engage in "net banging" by posting rap

21   videos that disrespect and advocate violence towards rival gangs.  Such videos often provoke

22   violence.  Petitioner appeared in several "net banging" videos recorded before his arrest on

23   December 15, 2016.  One video, entitled "No Air," was published on December 14, 2016,

24   the day before petitioner's arrest.  In the "No Air" video, petitioner raps about harming rival gang

25   members.  The video depicts petitioner holding what appears to be Glock handguns with extended

26   magazines, similar to the firearm found in the Mercedes.  Detective Shelton testified that posting

27   the video increased the likelihood that petitioner would need to be armed to protect himself from

28   retaliation from rival gang members.

4

1    Detective Shelton testified that December 15, the day petitioner was arrested, is known as

2    "Yeet Day," which is an honored day in G-Mobb culture because it is the anniversary of the death

3    of a prominent member of the gang.  On Yeet Day, gang tensions run high and there is an

4    increased likelihood of firearm possession and gang violence.  Detective Shelton also testified

5    that at the time of the offense in this case there was an active gang war between G-Mobb and the

6    Oak Park Bloods.  Due to the gang war, G-Mobb members usually were armed.  In a recorded jail

7    call, petitioner stated that he is not going to get "caught slippin'," meaning caught without a gun

8    by a rival gang member.

9          2.  Defense Case

10    The defense presented no evidence.

11    C.  Outcome

12    The jury found petitioner guilty of one count of possession of a firearm by a felon based

13    on the .45-caliber Glock found in the Mercedes.  The jury found true the special allegation that

14    petitioner carried a firearm or had a firearm available for use during the commission of the

15    offense.  The jury also found true the special allegation that petitioner committed the offense for

16    the benefit of a criminal street gang.  Petitioner was acquitted on the second gun count.

17    In a bifurcated proceeding, the trial court found true the allegation that petitioner had been

18    convicted of two prior serious felonies that qualified as strikes under the three strikes law.

19    Petitioner was sentenced to 25 years to life in prison under the three strikes law, with a

20    consecutive five-year sentence for the prior serious felony enhancement.  The court also imposed

21    a four-year sentence for the gang enhancement, to be served concurrently, for a total aggregate

22    term of 30 years to life in prison.

23    D.    Post-Conviction Proceedings

24    Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

25    conviction on July 2, 2019.  ECF No. 16-8.  The California Supreme Court denied review on

26    September 11, 2019.  ECF No. 16-9 at 1.

27    Petitioner filed a petition for writ of habeas corpus in Sacramento County Superior Court

28    during the pendency of his appeal, seeking relief under Proposition 57 (which provides for early

5

1   parole consideration of certain offenders).  That petition was denied as premature.  ECF No. 16-

2   10.

3            On December 21, 2020, petitioner filed a habeas petition in Sacramento County Superior

4   Court alleging the ineffective assistance of trial counsel and asserting his innocence.  The petition

5   was denied as untimely and on the merits.  ECF No. 16-12.  Petitioner did not submit his claims

6   to any higher state court.

7            The original federal petition was filed on December 7, 2020, ECF No. 1, and contained

8   the two claims that had been exhausted on direct appeal and are addressed herein.  Petitioner

9   thereafter filed an amended petition that added three additional claims (two claims of ineffective

10   assistance of counsel and one of actual innocence),[3] along with a motion for a stay pending

11   exhaustion.  See ECF Nos. 4, 5, 6, 8.  The motions for stay were ultimately denied, and the new

12   claims were dismissed.  ECF Nos. 7, 10.

13            <u>STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA</u>

14            28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

15   1996 ("AEDPA"), provides in relevant part as follows:

16            (d) An application for a writ of habeas corpus on behalf of a person
              in custody pursuant to the judgment of a state court shall not be
17            granted with respect to any claim that was adjudicated on the merits
              in State court proceedings unless the adjudication of the claim –
18

19            (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as
20            determined by the Supreme Court of the United States; or

21            (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
22            State court proceeding.

23            The statute applies whenever the state court has denied a federal claim on its merits,

24   whether or not the state court explained its reasons.  <u>Harrington v. Richter</u>, 562 U.S. 86, 99

25   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

26   absent any indication or state-law procedural principles to the contrary.  <u>Id.</u> (citing <u>Harris v. Reed</u>,

27   _____

28   [3]  These appear to be the same claims that were submitted at around the same time to the superior
     court.

1    489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

2    decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

3    may be overcome when there is reason to think some other explanation for the state court's

4    decision is more likely."  Id. at 99-100.

5            The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

6    principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

7    U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

8    Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

9    issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64

10   (2013).

11           A state court decision is "contrary to" clearly established federal law if the decision

12   "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

13   U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

14   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

15   the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

16   was incorrect in the view of the federal habeas court; the state court decision must be objectively

17   unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

18           Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

19   Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court

20   reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other

21   words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

22   Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

23   confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d

24   724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

25   summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

26   state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

27   must determine what arguments or theories may have supported the state court's decision, and

28   subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

7

1

DISCUSSION

2       I.       Claim One: Insufficient Evidence to Sustain Conviction in Violation of Due Process

3                    A.  Petitioner's Allegations and Pertinent State Court Record

4               Petitioner contends that the evidence was insufficient to prove beyond a reasonable doubt

5       that he possessed the .45 caliber Glock discovered in the vehicle in which he was a passenger.

6                    B.  The Clearly Established Federal Law

7               Due process requires that each essential element of a criminal offense be proven beyond a

8       reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

9       sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

10      the light most favorable to the prosecution, any rational trier of fact could have found the essential

11      elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

12      (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

13      the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

14      to that resolution."  Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground

15      of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos

16      v. Smith, 565 U.S. 1, 2 (2011).

17                   C.  The State Court's Ruling

18              This claim was raised on direct appeal.  Because the California Supreme Court denied

19      discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

20      decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

21      501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

22              The Court of Appeal ruled in relevant part as follows:

23                      When considering a challenge to the sufficiency of the evidence, we
                        review the entire record in the light most favorable to the judgment
24                      to determine whether it discloses substantial evidence such that a
                        reasonable trier of fact could find the defendant guilty beyond a
25                      reasonable doubt. (People v. Albillar (2010) 51 Cal.4th 47, 59-60.)
                        We do not reweigh the evidence or reevaluate the credibility of
26                      witnesses. (People v. Jennings (2010) 50 Cal.4th 616, 638.) We
                        resolve all conflicts in the evidence and draw all reasonable
27                      inferences in support of the conviction. (People v. Campbell (1994)
                        25 Cal.App.4th 402, 408.) A judgment will be reversed only if there
28                      is  no  substantial  evidence  to  support  the  verdict  under  any

hypothesis. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The issue here is whether there is substantial evidence to prove defendant possessed or controlled the firearm found beneath the driver's seat in the Mercedes. To sustain a conviction, it is not necessary to show the defendant had actual physical possession of a firearm. A conviction may be based on constructive possession, which is established if the defendant knowingly exercised a right to control, either personally or through another. (*People v. White* (2014) 223 Cal.App.4th 512, 524; *People v. Pena* (1999) 74 Cal.App.4th 1078, 1083-1084.) Possession need not be exclusive, and even transitory possession may be enough to establish a violation. (See *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1036; *People v. Neese* (1969) 272 Cal.App.2d 235, 245.)

Here, there is substantial evidence in the record to support a finding that defendant possessed the gun found in the Mercedes. On the day of the incident, December 15, 2016, defendant's girlfriend G.K. called 911 and reported that defendant was carrying a handgun. Law enforcement officers then tracked defendant using his GPS monitor, first to a house belonging to the family of a deceased gang member, and then to the restaurant parking lot where defendant was arrested.

Although no one testified to seeing defendant handle a gun, officers observed defendant lean into the driver's side window of the Mercedes before he got into the vehicle. In addition, because the windows of the vehicle were tinted, officers were unable to see anything that defendant may have done after he got into the Mercedes. A jury reasonably could infer that defendant either placed the gun under the seat before getting into the vehicle or that he passed or tossed the gun forward after getting into the vehicle.

The gang evidence further supports an inference that defendant possessed or controlled the firearm found in the Mercedes. Detective Shelton testified that defendant was a validated member of the G-Mobb gang, and that the primary activities of that gang include crimes involving firearms. Further, due to an active gang war, G-Mobb members almost always carried firearms, and often used females to hide those firearms.

Detective Shelton also testified that the day of the incident, December 15, known as "Yeet Day," is an honored day in G-Mobb gang culture, on which tensions run high and there is an increased likelihood of gang violence and gun possession. In addition, on December 14, the day before the incident, defendant posted the "No Air" net banging video. Detective Shelton testified that posting the video increased the likelihood that defendant would need to be armed to protect himself from rival gang members. [Fn: In a recorded jail call, defendant expressly referred to not getting "caught slippin'," meaning caught without a gun by a rival gang member.] In the video, defendant appears to be holding a Glock handgun with an extended magazine, similar to the gun found in the Mercedes.

The recorded jail conversations also reasonably support an inference that the firearm found in the Mercedes belonged to defendant and

that defendant used M.D. to hide the firearm (or at least allowed her to take responsibility for it).

In a call recorded later in the evening on the day of the incident, N.T. agreed with an unidentified female who said that defendant should take responsibility for the gun rather than let M.D. do so: "Exactly. Like how you gonna let her get locked uh, arrested for something that yours? . . . If you're fucking riding around with a gun, you need to be prepared to fucking take that charge . . . ."

Later that same night, defendant told N.T. that M.D. needs to "[k]eep her mouth shut." When N.T. remarked, "They already knew we was lying though," defendant responded, "Yeah I know."

On December 17, 2016, defendant was recorded telling G.K. that: "[The police] want me to be in jail or they want me to get killed. 'Cause either you want me to have it on me so you can take me to jail or you want me to not have it on me so one of these niggas could blow me." This statement reasonably could be construed as referring to a firearm.

A few weeks after the arrest, N.T. was recorded telling an inmate that during the incident defendant yelled at her to " 'grab it, grab it,' " but she couldn't because the car door was open and law enforcement officers could see her. N.T. then continues to tell the inmate, "But the fucked up part about it, the only thing that might fuck him off a little bit is it was the same one that he . . . just did a video to." N.T. admitted that her statement about the video was referring to guns, thereby implying that the gun found in the Mercedes is the same gun depicted in the net banging video.

Viewing the evidence in the light most favorable to the jury's finding, we conclude substantial evidence supports the jury's finding that defendant possessed the firearm.

ECF No. 16-8 at 7-9.

### D. Objective Reasonableness Under § 2254(d)

Although the state court did not cite Jackson v. Virginia, supra, it cited California caselaw that fully comports with Jackson and progeny. The court construed the evidence in the light most favorable to the jury's verdict and discussed the evidence in relation to the elements of liability, thus applying the correct constitutional standard. The appellate court's rulings on questions of state law—specifically, what constitutes "possession" for purposes of Cal. Penal Code § 29800(a)(1)—are binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (federal habeas court is bound by state court's interpretation of state law). The only question is whether

////

10

1  the state court unreasonably applied the <u>Jackson</u> standard in evaluating the evidence under the

2  governing state law standards.

3         There is nothing objectively unreasonable about the state court's analysis.  The evidence

4  cited by the court, construed in the light most favorable to the verdict, supports the jury's

5  conclusions for the reasons explained.  Petitioner urges a different interpretation of the evidence,

6  but the California Court of Appeal was obliged under <u>Jackson</u> to give deference to the verdict and

7  this court is obliged under 28 U.S.C. 2254(d) to give deference the state court's judgment.  <u>See</u>

8  <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011) (recognizing the "double dose of deference"

9  that applies to sufficiency of evidence claims under Due Process Clause and AEDPA).   Because

10  this is not a case in which "no rational trier of fact could have agreed with the jury," <u>Cavazos</u>, 565

11  U.S. at 2, federal habeas relief is unavailable.

12     II.     <u>Claim Two: Cruel and Unusual Sentence in Violation of the Eighth Amendment</u>

13             A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

14         Petitioner contends that the Eighth Amendment's prohibition on cruel and unusual

15  punishment is violated by the imposition of an indeterminate life sentence on a (then) 25-year-old

16  defendant for the "momentary, constructive possession of a firearm."  ECF No. 6 at 16.  He

17  argues that the sentence is "grossly disproportionate to the danger presented by Petitioner or his

18  crime," and in relation to the three-year maximum that applies to the offense outside the recidivist

19  sentencing context.  <u>Id.</u> at 16, 41.

20             B.  <u>The Clearly Established Federal Law</u>

21         The Eighth Amendment prohibits not only "barbaric punishments," <u>Solem v. Helm</u>, 463

22  U.S. 277, 284 (1983), but also "extreme sentences that are 'grossly disproportionate' to the

23  crime," <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003) (quoting <u>Harmelin v. Michigan</u>, 501 U.S.

24  957, 1001 (1991) (Kennedy J., concurring)).  The Supreme Court has upheld California' s three-

25  strikes sentencing law against facial Eighth Amendment challenge.  <u>Ewing</u>, 538 U.S. at 25-28.

26  Accordingly, it is clearly established that a life sentence for a relatively minor offense committed

27  by a recidivist does not per se violate the Eight Amendment.  <u>Id.</u>  Individual claims that a third-

28  strike sentence violates the Eighth Amendment are governed by proportionality principles that do

not merely weight the sentence against the offense conduct, but also take into account the state's legitimate interest in dealing harshly with recidivists.  Id. at 29-30.

The Supreme Court's Eighth Amendment jurisprudence clearly establishes that a "gross disproportionality principle" applies to sentences for terms of years.  Lockyer v. Andrade, 538 U.S. 63, 72 (2003).  Such a sentence will only constitute cruel and unusual punishment in "rare and extreme case[s]."  Id. at 73.  In Andrade, the Court rejected an Eighth Amendment claim brought by a habeas petitioner who had received a third-strike sentence of two consecutive 25-to-life terms for shoplifting $150 worth of videotapes.  The Court held that the California Court of Appeal's decision affirming the sentence was not contrary to, nor an unreasonable application of, Eighth Amendment principles within the meaning of § 2254(d).  Id. at 77.

C.  The State Court's Ruling

The California Court of Appeal ruled as follows:

> Cruel and unusual punishment is prohibited by the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution. Although the state and federal prohibitions are not coextensive,6 there is considerable overlap between them. The touchstone for each is "gross disproportionality." (People v. Palafox (2014) 231 Cal.App.4th 68, 82; People v. Baker (2018) 20 Cal.App.5th 711, 733; see also In re Lynch (1972) 8 Cal.3d 410, 424; Ewing v. California (2003) 538 U.S. 11, 20-21 [155 L.Ed.2d 108, 117] (Ewing) (lead opn. of O'Connor, J.); Graham v. Florida (2010) 560 U.S. 48, 59-60 [176 L.Ed.2d 825, 835-836].)

> The California Supreme Court has emphasized the " ' "considerable burden" ' " that a defendant must overcome in challenging a penalty as cruel or unusual. (People v. Sullivan (2007) 151 Cal.App.4th 524, 569.) The length of a sentence is largely a matter of legislative prerogative, and courts have held that a sentence will not be found to be unconstitutional except in "the rarest cases." (People v. Weddle (1991) 1 Cal.App.4th 1190, 1193; Ewing, supra, 538 U.S. at p. 21.)

> Defendant has failed to meet his burden to show the sentence he received is unconstitutionally cruel or unusual. Defendant's argument is premised on the disparity between the sentence he received (30 years to life) and the ordinary maximum term for a violation of his current offense (three years). (§ 1170, subd. (h).)

> However, defendant is not being punished solely because of his current offense. He also is being punished because of his cumulative record as a recidivist offender previously convicted of prior serious or violent felonies under the state's three strikes law. Courts almost uniformly have rejected claims that mandatory indeterminate sentences imposed under the three strikes law constitute cruel or

12

unusual punishment. (*See, e.g., People v. Cooper* (1996) 43 Cal.App.4th 815 [upholding sentence of 25 years to life for felon in possession of firearm]; *People v. Goodwin* (1997) 59 Cal.App.4th 1084 [upholding 25-year-to-life term for commercial burglary and petty theft with a prior]; *People v. Barrera* (1999) 70 Cal.App.4th 541 [upholding 25-year-to-life term for check forgery]; *People v. Cortez* (1999) 73 Cal.App.4th 276 [upholding 25-year-to-life term for felon in possession of firearm]; *Ewing, supra*, 538 U.S. 11 [upholding 25-year-to-life term for felony grand theft]; *Lockyer v. Andrade* (2003) 538 U.S. 63 [155 L.Ed.2d 144] [upholding two 25-year-to-life terms for two counts of petty theft with a prior].) The "rare case" finding a sentence to be cruel or unusual typically involves a long sentence imposed for a largely passive, technical violation of the law, such as failure to timely update a sex offender registration. (*See People v. Carmony* (2005) 127 Cal.App.4th 1066, 1077, 1084.)

Considering the lengthy and serious nature of defendant's criminal history [Fn: Defendant has adult convictions for resisting a peace officer (twice), assault with a firearm, and carrying a concealed weapon in a car (with a gang enhancement), as well as multiple juvenile adjudications], as well as the nature of his current offense—possession of a firearm by a felon, with a gang enhancement—we conclude that defendant's sentence is neither cruel nor unusual punishment.

ECF No. 16-8 at 10-11.

D.  Objective Reasonableness Under § 2254(d)

The Court of Appeal correctly identified the governing Eighth Amendment principles, and it applied them reasonably. The state court was faithful to U.S. Supreme Court precedent in rejecting petitioner's "gross disproportionality" theory, which simply compared the third-strike life sentence to the ordinary maximum term for the same offense. As the U.S. Supreme Court emphasized in Ewing, supra, disproportionality review must weigh the sentence imposed not only against the gravity of the current felony, but against the defendant's criminal history and the legitimate state interest in "incapacitating and deterring recidivist felons." 538 U.S. at 29-30.

Both Ewing and Andrade, supra, involved indeterminate life sentences imposed for nonviolent property offenses. The defendant in Ewing had stolen three golf clubs. 538 U.S. 11, 30-31. The defendant in Andrade was convicted on two counts of petty theft. 538 U.S. at 66-68. Both defendants were sentenced as third strikers. Both sentences passed constitutional muster

////

////

13

1  according to the U.S. Supreme Court.  This authority governs petitioner's claim, and precludes

2  relief.[4]  If it is not "grossly disproportionate" to sentence someone to life in prison for simple

3  shoplifting, it cannot be "grossly disproportionate" to impose a similar sentence for firearms

4  possession by a gang member with a history of violence.

5         Because the decision of the California Court of Appeal involved no objectively

6  unreasonable application of U.S. Supreme Court precedent, federal habeas relief is unavailable.

7                                      CONCLUSION

8         For all the reasons explained above, the state courts' denial of petitioner's claims was not

9  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  [Even without reference to

10  AEDPA standards, petitioner has not established any violation of his constitutional rights.]

11  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

12  denied.

13         These findings and recommendations are submitted to the United States District Judge

14  assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

15  after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

18  he shall also address whether a certificate of appealability should issue and, if so, why and as to

19  which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

20  within fourteen days after service of the objections.  The parties are advised that failure to file

21  ////

22  ////

23  ////

24  ////

---

25  [4]  The rare habeas cases that fall outside the scope of Ewing and Andrade involve petitioners with
26  minimal criminal histories, who were subjected to recidivist sentencing only because of an abuse
    of prosecutorial discretion.  See Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004) (affirming grant
27  of habeas relief on Eighth Amendment grounds where commitment offense and two prior strike
    offenses, petitioner's only previous convictions, all involved simple shoplifting).  This is not such
28  a case.

objections within the specified time may waive the right to appeal the District Court's order.

<u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 8, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE